# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Panhandle Eastern Pipeline Co. v. Hamer*, 2012 IL App (1st) 113559

---

| | |
|---|---|
| Appellate Court Caption | PANHANDLE EASTERN PIPELINE COMPANY, a Delaware Corporation, and TEXAS EASTERN TRANSMISSION CORPORATION, a Delaware Corporation, Plaintiffs-Appellees, v. BRIAN A. HAMER, as Director of the Department of Revenue, and THE DEPARTMENT OF REVENUE, Defendants-Appellants. |
| District & No. | First District, Fifth Division<br>Docket No. 1-11-3559 |
| Filed | December 7, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The calculation of plaintiffs' right to a corporate income tax refund on their natural gas pipelines that crossed Illinois but neither began nor ended within the state, based on the inclusion of the miles that gas flowed through Illinois in the numerator of the apportionment formula, did not violate the commerce clause; therefore, the Department of Revenue's denial of refunds was reinstated. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-L-051281; the Hon. Robert Lopez Cepero, Judge, presiding. |
| Judgment | Reversed. |

Counsel on
Appeal

Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Laura Wunder, Assistant Attorney General, of counsel), for appellants.

Craig B. Fields and Mitchell A. Newmark, both of Morrison & Foerster LLP, and Fred O. Marcus and David A. Hughes, both of Horwood Marcus & Berk Chtrd., both of Chicago, for appellees.

Panel

PRESIDING JUSTICE McBRIDE delivered the judgment of the court, with opinion.

Justices Howse and Taylor concurred in the judgment and opinion.

## OPINION

¶ 1    Defendants, Brian Hamer, as Director of the Illinois Department of Revenue (the Director) and the Illinois Department of Revenue (the Department), appeal from the circuit court's order reversing the Department's denial of refunds for corporate income tax and interest to plaintiffs, Panhandle Eastern Pipeline Company and Texas Eastern Transmission Corporation. Plaintiffs had filed amended tax returns seeking a refund of income tax paid under section 304(d)(2) of the Illinois Income Tax Act (Tax Act) (35 ILCS 5/304(d)(2) (West 2010)) on its gas pipelines that traverse Illinois, but neither begin nor end within Illinois.

¶ 2    The Department argues that its decision denying the tax refunds should be reinstated because the miles that plaintiffs' gas flowed through Illinois were includable in the numerator of section 304(d)(2)'s apportionment formula and plaintiffs failed to establish that section 304(d)(2) violated the commerce clause.

¶ 3    No evidentiary hearing or trial was held in this case. The parties submitted a joint stipulation of facts to the administrative law judge (ALJ).

¶ 4    Duke Energy Corporation (Duke), through its subsidiaries, was engaged in the receipt, transportation, storage and delivery of natural gas in various states, including Illinois. The time periods at issue are the tax years ending December 31, 1997, December 31, 1998, December 31, 1999, and December 31, 2000 (tax years). During these time periods, three natural gas pipelines systems owned and operated by subsidiaries of Duke traversed Illinois: the Panhandle system, the Texas Eastern Transmission system, and the Trunkline Gas Transmission system. These three pipeline systems transported natural gas owned by others.

¶ 5    During tax years 1997 and 1998, Panhandle Eastern Pipeline Company (Panhandle) was engaged in the business of transporting natural gas by pipeline and was a wholly owned subsidiary of PanEnergy Corporation, which was owned by Duke. The Panhandle pipeline system began in Kansas and terminated in Michigan. Panhandle operated approximately 1,228 miles out of the approximately 6,334 total miles of the pipeline in Illinois. Panhandle

owned and operated four compressor stations in Illinois. These compressor stations operated a total of 49 engines.

¶ 6     During the tax years, Texas Eastern Transmission Corporation (TETCO) was engaged in the business of transporting natural gas by pipeline and was a wholly owned subsidiary of PanEnergy. The TETCO pipeline system began in Texas and terminated in New Jersey. TETCO operated approximately 110 miles in Illinois out of the approximately 9,000 total miles of the pipeline. TETCO operated two compressor stations in Illinois with nine engines, though one of the stations was idle during the tax years.

¶ 7     During tax years 1997 and 1998, the Trunkline Gas Company (Trunkline) was engaged in the business of transporting natural gas and was a wholly owned subsidiary of Panhandle. The Trunkline pipeline system began in Texas and Louisiana and terminated in Michigan. Trunkline operated 725 miles of the approximately 4,142 total miles of pipeline in Illinois. Trunkline operated three compressor stations with 22 total engines.

¶ 8     All of the compressor stations owned by Panhandle, Trunkline and TETCO were staffed 24 hours per day, 365 days a year. However, the compressor stations did not operate 24 hours a day. The compressor stations recompressed the natural gas to move the gas through the pipelines and the gas could not move without the pressure generated by the compressor stations. Duke and its subsidiaries owned the land on which the compressor stations were located and had obtained permanent easements for the pipelines.

¶ 9     Plaintiffs do not dispute that they had a physical presence in Illinois and were subject to Illinois income tax. However, plaintiffs contest the computation of the amount of income tax due for the tax years.

¶ 10     Duke's transportation unitary business group operated pipelines that transported natural gas. Panhandle was the designated agent for Duke's unitary group of companies in the tax years 1997 and 1998. In 1999, Duke sold Panhandle and Trunkline to another energy company. TETCO became the designated agent for the tax years after 1998. Panhandle and TETCO, as the designated agents, were the named plaintiffs in this case.

¶ 11     For the 1997 and 1998 tax years, Panhandle filed Illinois income tax returns for the unitary business group, paying $506,541 and $1,422,195, respectively. In October 2001, Panhandle filed an amended return claiming a tax refund of $247,624 for the 1997 tax year. In October 2002, Panhandle also filed an amended tax return for the 1998 tax year, seeking a tax return of $1,044,522.

¶ 12     TETCO filed income tax returns for tax years 1999 and 2000, initially paying Illinois income tax of $3,480,942 and $54,230, respectively. In March 2003, TETCO filed amended tax returns for both tax years, claiming a tax refund of $2,713,162 for tax year 1999, and $47,874 for tax year 2000.

¶ 13     The amended tax returns excluded miles traveled by natural gas in pipelines through Illinois from the numerator of its apportionment factor, set forth in section 304(d)(2) of the Tax Act (35 ILCS 5/304(d)(2) (West 2010)), where the natural gas did not originate or terminate within Illinois. The claims for refunds were the difference paid prior to the change in the calculation.

¶ 14     Section 304(d)(2) provides:

"Such business income derived from transportation by pipeline shall be apportioned to this State by multiplying such income by a fraction, the numerator of which is the revenue miles of the person in this State, and the denominator of which is the revenue miles of the person everywhere. For the purposes of this paragraph, a revenue mile is the transportation by pipeline of 1 barrel of oil, 1,000 cubic feet of gas, or of any specified quantity of any other substance, the distance of 1 mile for a consideration." 35 ILCS 5/304(d)(2) (West 2010).

¶ 15    In November 2005, the Department denied Panhandle's claims for refunds for tax years 1997 and 1998 and TETCO's claims for refunds for tax years 1999 and 2000. Both companies filed a protest to the denial.

¶ 16    In the stipulation of facts, the parties agreed that if the ALJ adopted the plaintiffs' position that the miles traveled by natural gas transported in pipelines through Illinois did not constitute revenue miles in the state that were includable in the numerator of the plaintiffs' Illinois apportionment factor where the gas neither originates nor terminates in Illinois, the notice of denial would be reversed and the refunds for the tax years would be processed.

¶ 17    The parties further agreed that if the ALJ adopted the Department's position that miles traveled by natural gas transported in pipelines through Illinois that neither originates nor terminates in Illinois constituted revenue miles in the state that were includable in the numerator of the plaintiffs' apportionment factor, plaintiffs were not entitled to refunds for the tax years unless such revenue miles were excludable from the numerator of the plaintiffs' apportionment formula under an alternative method of apportionment.

¶ 18    In August 2009, the ALJ issued a recommended decision affirming the Department's denial of the claims for tax refunds. The ALJ disagreed with plaintiffs' position that the "flow-through" miles, the miles that the natural gas traveled in Illinois as part of plaintiffs' interstate pipeline that neither originated nor terminated in Illinois, were not considered revenue miles "in this State" as provided in section 304(d)(2). The ALJ found that the record was "replete with evidence of physical and economic contacts between Illinois and the flow-through miles the state seeks to include in the numerator of the taxpayers' apportionment formula." The ALJ also concluded that the statutory language was clear and if the legislature had intended for the narrow construction urged by plaintiffs, then it would have included such limiting language. Further, the ALJ observed that plaintiffs' construction of section 304(d)(2) "would result in the assignment of less than 100% of the taxpayers' income to the states in which the taxpayers are subject to tax." The ALJ held that the Department's interpretation of section 304(d)(2) "best effectuates the legislative intent of this section in accordance with the dictates of the Illinois Supreme Court." The ALJ also rejected plaintiffs' contention that including the flow-through miles in the apportionment factor would violate the commerce clause.

¶ 19    In August 2009, the Director issued a notice of decision that the recommendation of the ALJ had been accepted by the Director as "dispositive of the issues therein." In September 2009, plaintiffs filed a complaint for administrative review of the Department's decision in the circuit court.

¶ 20    In November 2011, the trial court issued its memorandum decision and judgment order.

The court reversed the Director's notice of decision and held that plaintiffs were entitled to the tax refunds claimed. The court specifically found that while plaintiffs' presence and activities in Illinois were sufficient for Illinois to assess an income tax on flow-through miles of gas, "Illinois did not tax the flow-through gas during the [tax years.]" The court based its reasoning on the General Assembly's amendment to section 304(d) in 2007 (see Pub. Act 95-233 (eff. Aug. 16, 2007)) "by terminating the applicability of Section 304(d)(2) and providing for the applicability of Section 304(d)(3) which new subsection includes flow-through gas in the numerator of the apportionment factor." The trial court concluded that the two distinct formulas set forth in sections 304(d)(2) and 304(d)(3) "demonstrate that the General Assembly intended to prospectively change and not merely clarify Section 304(d)."

¶ 21        This appeal followed.

¶ 22        On appeal, the Department argues that it correctly included the flow-through miles of natural gas in the numerator of plaintiffs' apportionment factor as set forth in section 304(d)(2) because the flow-through miles constituted revenue miles in this state.

¶ 23        When a party appeals the circuit court's decision on a complaint for administrative review, the appellate court's role is to review the administrative decision rather than the circuit court's decision. *Siwek v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 324 Ill. App. 3d 820, 824 (2001). The Administrative Review Law provides that judicial review of an administrative agency decision shall extend to all questions of law and fact presented by the entire record before the court. 735 ILCS 5/3-110 (West 2010). The factual determinations of an administrative agency are deemed *prima facie* true and correct. 735 ILCS 5/3-110 (West 2010) "The standard of review, 'which determines the degree of deference given to the agency's decision,' turns on whether the issue presented is a question of fact, a question of law, or a mixed question of law and fact." *Comprehensive Community Solutions, Inc. v. Rockford School District No. 205*, 216 Ill. 2d 455, 471 (2005) (quoting *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 390 (2001)).

¶ 24        Here, no questions of fact have been raised on appeal. "Courts recognize that agencies can make informed judgments upon the issues, based upon their experience and expertise." *Hartmarx Corp. & Subsidiaries v. Bower*, 309 Ill. App. 3d 959, 964 (1999). "As the agency charged with administration and enforcement of the [Tax Act,] the Department's interpretation of the Act is relevant and will receive some deference on review. However, the Department's interpretation is not binding on this court and review proceeds *de novo*." *Northwest Airlines, Inc. v. Department of Revenue*, 295 Ill. App. 3d 889, 892 (1998) (citing *Branson v. Department of Revenue*, 168 Ill. 2d 247, 254 (1995)).

¶ 25        "Tax laws must be strictly construed; they must be given a reasonable construction, without bias or prejudice against either the State or the taxpayer, in order to effectuate the intent of the legislature." *Northwest Airlines*, 295 Ill. App. 3d at 892 (citing *Van's Material Co. v. Department of Revenue*, 131 Ill. 2d 196, 202 (1989)). Further, the language of the tax statute shall not be "extended or enlarged beyond its clear import" and "where the legislature has seen fit to define a particular statutory term, we are bound by the definition as long as it is reasonable." *Texaco-Cities Service Pipeline Co. v. McGaw*, 182 Ill. 2d 262, 275 (1998).

"A tax statute must be strictly construed against the government and in favor of the taxpayer." *Kankakee County Board of Review v. Property Tax Appeal Board*, 226 Ill. 2d 36, 52 (2007).

¶ 26 The parties maintain the same positions previously asserted. The Department argues that the flow-through gas miles were properly included in the numerator of the apportionment factor set forth in section 304(d)(2). In contrast, plaintiffs contend that the flow-through gas miles should not be included in the numerator of the apportionment factor because the language of section 304(d)(2) provides only for the revenue miles "in this State" to be included in the numerator. The flow-through gas miles are not "in this State" because the gas originates and terminates outside of Illinois.

¶ 27 "The purpose of *** article 3 of the [Tax Act] is to assure that 100%, and no more or no less, of the business income of a corporation doing multistate business is taxed by the States having jurisdiction to tax it." *GTE Automatic Electric, Inc. v. Allphin*, 68 Ill. 2d 326, 335 (1977); see also *Hartmarx Corp.*, 309 Ill. App. 3d at 967-68. "In our opinion there is a clearly demonstrated legislative intent to allocate and apportion the business income from the multistate operations of a corporation with those other States having jurisdiction to tax such income in such manner that there is neither overlap nor gap in taxing all of such income derived from the multistate business." *GTE*, 68 Ill. 2d at 339.

¶ 28 Under the Tax Act, section 304(d)(2) calculates the tax apportionment factor with "the revenue miles of the person in this State" in the numerator and "the revenue miles of the person everywhere" in the denominator. 35 ILCS 5/304(d)(2) (West 2010). The statute defines "revenue miles" as "the transportation by pipeline of *** 1,000 cubic feet of gas *** the distance of 1 mile for a consideration." 35 ILCS 5/304(d)(2) (West 2010). This formula is used to compute the percentage of a corporation's business conducted in Illinois.

¶ 29 The cardinal rule in construing a statute, to which all others are subordinate, is to ascertain and give effect to the intent of the legislature. *Alvarez v. Pappas*, 229 Ill. 2d 217, 228 (2008). To determine legislative intent, we turn to the language of the statute, which is the best indicator of its intent. *Alvarez*, 229 Ill. 2d at 228. We must give the statutory language its "plain, ordinary, and popularly understood meaning," and "[w]here the language is clear and unambiguous, the statute must be given effect as written without resort to further aids of statutory construction." *Alvarez*, 229 Ill. 2d at 228. "[A]ll words and phrases must be interpreted in light of other relevant provisions of the statute and must not be construed in isolation." *Brucker v. Mercola*, 227 Ill. 2d 502, 514 (2007). "Each word, clause and sentence of the statute, if possible, must be given reasonable meaning and not rendered superfluous." *Brucker*, 227 Ill. 2d at 514.

¶ 30 Plaintiffs contend that the phrase "in this State" does not include the flow-through miles because "the word 'in' does not mean 'through.' " As cited by plaintiffs, "in" is defined in Black's Law Dictionary as meaning "expressing relation of presence, existence, situation, inclusion, action, etc.; inclosed or surrounded by limits, as in a room; also meaning for, in

and about, on within, etc." Black's Law Dictionary 758 (6th ed. 1990).[1] Plaintiffs focus on the "surrounded by limits" portion of the definition and argue that the revenue miles in this state are enclosed or surrounded by the limits of Illinois borders, but the gas is not limited by Illinois borders and continues to flow beyond Illinois. However, plaintiffs have only focused on one phrase of the definition. We point out that "in" also relates to a presence or existence. Though not confined to Illinois, plaintiffs' pipelines and the gas are present and exist in Illinois, as the flow-through miles transport natural gas by pipeline.

¶ 31      Plaintiffs' construction of "in this State" strains the natural meaning of the statute and legislative purpose. As previously stated, the apportionment factor is intended to apportion the income tax from businesses engaged in multistate operations by those states with jurisdiction such that the business pays 100% of the taxes owed and no overlaps or gaps in the imposition exist. The natural gas supplied by plaintiffs flows through Illinois, though neither originating nor terminating here. Plaintiffs' interpretation of section 304(d)(2) would create a gap in the apportionment of taxes as they would no longer be subject to income tax in Illinois, despite having pipelines that allow the flow of gas through the state. The apportionment factor includes the revenue miles in this state as the numerator with the denominator as the revenue miles everywhere. Under plaintiffs' interpretation, the miles in Illinois would not be included in the numerator, but would exist in the denominator. The exclusion of the flow-through miles would create a taxation gap because the flow-through miles would not be subject to tax in any other jurisdiction. These taxation gaps are to be avoided. See *GTE*, 68 Ill. 2d at 339.

¶ 32      In contrast, the Department's interpretation of the statute accomplishes the legislative purpose by allowing Illinois to collect its share of plaintiffs' income tax under the apportionment factor. Under the Department's construction, no gaps in taxation would arise because the flow-through miles would be included in the numerator for the portion in Illinois as well as in the denominator as part of the pipeline everywhere.

¶ 33      Nevertheless, plaintiffs contend that the General Assembly's addition of section 304(d)(3) establishes that section 304(d)(2) does not include the flow-through miles because section 304(d)(3) specifically includes the movement of gas that originates in one state or jurisdiction and terminates in another state or jurisdiction. 35 ILCS 5/304(d)(3) (West 2010).

¶ 34      In 2007, the General Assembly amended section 304(d) by adding a new subsection, which outlined a different method for computing the apportionment factor. Section 304(d)(3) provides:

> "For taxable years ending on or after December 31, 2008, business income derived from providing transportation services other than airline services shall be apportioned to this State by using a fraction, (a) the numerator of which shall be (i) all receipts from any movement or shipment of people, goods, mail, oil, gas, or any other substance (other than by airline) that both originates and terminates in this State, plus (ii) that portion of the person's gross receipts from movements or shipments of people, goods, mail, oil, gas,

---

[1]We note that subsequent editions of Black's Law Dictionary no longer provide a definition for "in."

or any other substance (other than by airline) that originates in one state or jurisdiction and terminates in another state or jurisdiction, that is determined by the ratio that the miles traveled in this State bears to total miles everywhere and (b) the denominator of which shall be all revenue derived from the movement or shipment of people, goods, mail, oil, gas, or any other substance (other than by airline)." 35 ILCS 5/304(d)(3) (West 2010)[2].

¶ 35    Plaintiffs assert that section 304(d)(3) is a substantive change from section 304(d)(2). According to plaintiffs, section 304(d)(3) demonstrates that the flow-through miles were not intended to be included under section 304(d)(2). We disagree.

¶ 36    While section 304(d)(3) clearly includes any flow-through miles as part of the apportionment factor for tax years 2008 and later, it does not apply to the tax years at issue in this case. Section 304(d)(3) sets forth a new calculation of the apportionment factor. The apportionment factor no longer uses "revenue miles" as the determining figure for the apportionment factor, but instead calculates the apportionment factor based on receipts. The legislature's enactment of a new method for calculating the apportionment factor, which expressly includes flow-through miles, does not mean that flow-through miles could not have been included in the numerator under section 304(d)(2). Section 304(d)(3)'s formula for calculating the apportionment factor has no effect on our construction of section 304(d)(2). Just because section 304(d)(3) specifically provides for the inclusion of flow-through miles, it does not follow that section 304(d)(2)'s apportionment factor excluded the miles.

¶ 37    Plaintiffs also rely on the decision in *Northwest Airlines* as support for their position. In that case, Northwest Airlines challenged the inclusion of "flyover miles" in the numerator of its apportionment factor. Northwest Airlines was subject to the same apportionment factor as plaintiffs: "the revenue miles of the airline 'in this State.' " *Northwest Airlines*, 295 Ill. App. 3d at 892 (quoting 35 ILCS 5/304(d)(1) (West 1996)). The "flyover miles" at issue were the miles the airline flew in Illinois air space, where the flight neither originated nor terminated in Illinois. *Northwest Airlines*, 295 Ill. App. 3d at 892-93. The Department had held that the flyover miles were included in the apportionment factor and this interpretation facilitated 100% apportionment of taxes and was not preempted by federal law or a violation of the commerce clause. *Northwest Airlines*, 295 Ill. App. 3d at 891.

¶ 38    The reviewing court disagreed, finding that the record failed to demonstrate a sufficient nexus between Illinois income tax and the transactions in Illinois. *Northwest Airlines*, 295 Ill. App. 3d at 894.

"There are no voice communications with overflights, and such flights make no use of Illinois facilities, services, or employees. There exists no physical contact between

---

[2]Section 304(d)(3) originally included in the apportionment factor "(ii) that portion of the person's gross receipts from movements or shipments of people, goods, mail, oil, gas, or any other substance (other than by airline) passing through, into, or out of this State" in the numerator. Pub. Act 95-233 (eff. Aug. 16, 2007) (adding 35 ILCS 5/304(d)(3)). The subsection was amended shortly thereafter to include the current language. Pub. Act 95-707 (eff. Jan. 11, 2008) (amending 35 ILCS 5/304(d)(3) (West 2010)).

overflights and this state, nor any economic connection. We do not find the mere possibility that an overflight will avail itself of services and facilities in this state in the event of an unscheduled landing sufficient to establish nexus. To the extent there is some uncertainty as to what constitutes sufficient nexus, we need not reach that issue, as here there is a *total* absence of any nexus between the overflights and this state." (Emphasis in original.) *Northwest Airlines*, 295 Ill. App. 3d at 894.

¶ 39 The court recognized the purpose of the Tax Act was to provide for 100% apportionment of the tax burden on a company engaged in multistate business by the states with jurisdiction to tax it, but under these circumstances, full apportionment could not be achieved outside the constitutional parameters set by the supreme court. *Northwest Airlines*, 295 Ill. App. 3d at 894.

¶ 40 While the tax issue in *Northwest Airlines* is similar to the present case, the circumstances of that case are significantly different. The biggest difference between the "flyover miles" of *Northwest Airlines* and the "flow-through miles" at issue in the present case is that plaintiffs had a physical presence in Illinois to maintain the flow of the natural gas to its destination whereas the airplanes had no contact with Illinois while flying over the state. The airline contested its presence in the state for the purposes of the Tax Act and the flyover miles. Plaintiffs have conceded that they had compressor stations, employed Illinois residents and had permanent easements for the pipeline. Plaintiffs also admit that they are subject to the Tax Act, but dispute the formula used to compute the income tax owed. Here, plaintiffs have pipelines in Illinois which allow natural gas to flow through the state.

¶ 41 We conclude that plaintiffs' flow-through miles were properly included in the numerator of the apportionment factor for the tax years. Under the rules for statutory interpretation, the Department's interpretation of section 304(d)(2) best accomplishes the legislative intent by apportioning plaintiffs' income tax burden in Illinois and does not create a gap in taxation for plaintiffs' interstate business.

¶ 42 Plaintiffs argue that even if we determine that the flow-through miles were included in the numerator of the apportionment factor, this inclusion violates the commerce clause of the United States Constitution.

¶ 43 "To withstand a claim that it has unconstitutionally burdened interstate commerce, a state tax must satisfy the four-part test enunciated in *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274 *** (1977)." *Irwin Industrial Tool Co. v. Department of Revenue*, 238 Ill. 2d 332, 341-42 (2010). "Under *Complete Auto*, the tax must: (1) be applied to an activity with a substantial nexus with the taxing state; (2) be fairly apportioned; (3) not discriminate against interstate commerce; and (4) be fairly related to the services provided by the state." *Irwin Industrial*, 238 Ill. 2d at 341 (citing *Complete Auto*, 430 U.S. at 279).

¶ 44 Plaintiffs assert that the inclusion of the flow-through miles fails to satisfy the first and last prongs of *Complete Auto* test. We first consider whether the flow-through miles have a substantial nexus with Illinois.

¶ 45 "The Due Process and Commerce Clauses of the Constitution do not allow a State to tax income arising out of interstate activities–even on a proportional basis–unless there is a ' "minimal connection" or "nexus" between the interstate activities and the taxing State, and

"a rational relationship between the income attributed to the State and the intrastate values of the enterprise." ' " *Container Corp. of America v. Franchise Tax Board*, 463 U.S. 159, 165-66 (1983) (quoting *Exxon Corp. v. Department of Revenue*, 447 U.S. 207, 219-20 (1980), quoting *Mobil Oil Corp. v. Commissioner of Taxes*, 445 U.S. 425, 436, 437 (1980)). " '[A] corporation may have the "minimum contacts" with a taxing State as required by the Due Process Clause, and yet lack the "substantial nexus" with that State as required by the Commerce Clause.' " *Brown's Furniture, Inc. v. Wagner*, 171 Ill. 2d 410, 422 (1996) (quoting *Quill Corp. v. North Dakota*, 504 U.S. 298, 313 (1992)). "At the very least, this set of principles imposes the obvious and largely self-executing limitation that a State not tax a purported 'unitary business' unless at least some part of it is conducted in the State." *Container Corp.*, 463 U.S. at 166.

¶ 46    The Illinois Supreme Court in *Brown's Furniture* considered what amount of physical presence satisfied the nexus requirement under the commerce clause. The supreme court observed that the United States Supreme Court in *Quill* found that the "slightest" physical presence was not sufficient, but left unclear the extent of physical presence necessary to establish a nexus. *Brown's Furniture*, 171 Ill. 2d at 423.

¶ 47    The Illinois Supreme Court considered a decision from the Court of Appeals of New York and concluded that it correctly stated the rule for a sufficient nexus.

> " 'While a physical presence of the vendor is required, it need not be substantial. Rather, it must be demonstrably more than a "slightest presence" [citation]. And it may be manifested by the presence in the taxing State of the vendor's property or the conduct of economic activities in the taxing State performed by the vendor's personnel or on its behalf.' " *Brown's Furniture*, 171 Ill. 2d at 424 (quoting *Orvis Co. v. Tax Appeals Tribunal*, 654 N.E.2d 954, 961 (N.Y. 1995)).

See also *Irwin Industrial*, 238 Ill. 2d at 342.

¶ 48    Here, plaintiffs maintained more than the "slightest" presence in Illinois. Plaintiffs operated several compressor stations in Illinois, employed Illinois residents at the compressor stations, owned the land where the stations were located, and obtained permanent easements for the pipelines' path through Illinois. As plaintiffs admit in the stipulated facts, the compressor stations recompressed the natural gas to move the gas through the pipelines and the gas could not move without the pressure generated by the compressor stations. These activities by plaintiffs were physically connected to Illinois and were sufficient to establish a nexus between plaintiffs' interstate activities and Illinois, as the taxing state.

¶ 49    We are not persuaded by plaintiffs' reliance on *Goldberg v. Sweet*, 488 U.S. 252 (1989), and *United Air Lines, Inc. v. Mahin*, 410 U.S. 623 (1973). Both cases are distinguishable from the instant case. Neither case involved an apportioned income tax but, instead, *Goldberg* considered a tax imposed on a consumer's purchase of interstate calls, which the Supreme Court found similar to a sales tax (*Goldberg*, 488 U.S. at 262), and *Mahin* involved a use tax imposed on the purchase of aviation fuel based on the storage of fuel (*Mahin*, 410 U.S. at 627-28). Contrary to plaintiffs' assertion, neither case sets forth an exception for "traveling through a state" to be unable to establish a sufficient nexus. The Supreme Court in *Mahin* upheld the imposition of a use tax on fuel held in Illinois, finding the taxable event

-10-

to be storage, not consumption. *Mahin*, 410 U.S. at 631. In *Goldberg*, while the Supreme Court observed that multiple taxation on interstate telecommunications was unlikely because it doubted that "States through which the telephone call's electronic signals merely pass have a sufficient nexus to tax that call," the question of whether a substantial nexus existed was not raised because the parties agreed the nexus existed. *Goldberg*, 488 U.S. at 260, 263.

¶ 50　　Plaintiffs also argue that the inclusion of the flow-through miles in the apportionment factor is not fairly related to the services provided by the State, the fourth prong of the *Complete Auto* test. "The purpose of this test is to ensure that a State's tax burden is not placed upon persons who do not benefit from services provided by the State." *Goldberg*, 488 U.S. at 266-67.

> "The tax which may be imposed on a particular interstate transaction need not be limited to the cost of the services incurred by the State on account of that particular activity. [Citation.] On the contrary, 'interstate commerce may be required to contribute to the cost of providing *all* governmental services, including those services from which it arguably receives no direct "benefit." ' [Citation.] The fourth prong of the *Complete Auto* test thus focuses on the wide range of benefits provided to the taxpayer, not just the precise activity connected to the interstate activity at issue." (Emphasis in original.) *Goldberg*, 488 U.S. at 267 (quoting *Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 627 n.16 (1981)).

The Supreme Court has found that "a taxpayer's receipt of police and fire protection, the use of public roads and mass transit, and the other advantages of civilized society satisfied the requirement that the tax be fairly related to benefits provided by the State to the taxpayer." *Goldberg*, 488 U.S. at 267. "*Complete Auto*'s fourth criterion asks only that the measure of the tax be reasonably related to the taxpayer's presence or activities in the State." *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 200 (1995).

¶ 51　　Plaintiffs agree that they have a tax liability to Illinois for the tax years, but assert that they have paid for the services provided by Illinois by paying tax on the gas that originates, terminates or originates and terminates in Illinois. In support, plaintiffs cite the decision in *American River Transportation Co. v. Bower*, 351 Ill. App. 3d 208 (2004).

¶ 52　　In that case, the plaintiff operated a line of tugboats on the Mississippi, Ohio and Illinois Rivers. The fuel and supplies at issue in the case were loaded in St. Louis, Missouri. These tugboats, called line haul vessels, spent 50% of their time pushing barges in Illinois waters, but never docked in Illinois. Smaller harbor service tugs moved the barges between the line haul vessels and Illinois ports. The harbor service tugs purchased fuel in Illinois and paid use tax for the purchases. *Bower*, 351 Ill. App. 3d at 209-11.

¶ 53　　In considering the burden to the commerce clause, the reviewing court found a substantial nexus between Illinois and the tugboats. *Bower*, 351 Ill. App. 3d at 212. However, the court concluded that the imposition of the use tax had no relation to any services supplied by Illinois because Illinois provided no services to the line haul vessels, and the waterways were maintained by United States. *Bower*, 351 Ill. App. 3d at 212. The court determined that the plaintiff paid for the benefit of civilized society and clean waters in the payment of the use tax for the harbor service tugs. *Bower*, 351 Ill. App. 3d at 212.

¶ 54 Plaintiffs contend that Illinois has been compensated for the services it provides to plaintiffs, but the flow-through miles, like the line haul vessels, do not have sufficient contact with Illinois to warrant the inclusion in the numerator of the apportionment factor. However, the Supreme Court has stated that the relevant inquiry is not "the amount of the tax the value of the benefits allegedly bestowed as measured by the costs the State incurs on account of the taxpayer's activities." *Commonwealth Edison*, 453 U.S. at 625. Instead, the test for the fourth prong "imposes the additional limitation that the *measure* of the tax must be reasonably related to the extent of the contact" because the activities or presence of the taxpayer in the State may properly bear the tax burden. (Emphasis in original.) *Commonwealth Edison*, 453 U.S. at 626.

¶ 55 We disagree with plaintiffs. Illinois provides services, such as police and fire protection, public roads, and other advantages of civilized society, for all of plaintiffs' presence in the state. As previously discussed, plaintiffs operate several compressor stations across Illinois to maintain the flow of the natural gas, staffed by Illinois employees, and on Illinois land owned by plaintiffs. Unlike the line haul vessels in *Bower*, plaintiffs maintain a significant presence in Illinois and enjoy the benefits that Illinois provides for its property and operations in Illinois. Accordingly, we conclude that the inclusion of the flow-through miles in the numerator of the apportionment factor pursuant to section 304(d)(2) is consistent with the commerce clause.

¶ 56 Based on the foregoing reasons, we reverse the order of the circuit court of Cook County and reinstate the decision of the Director accepting the recommendation of the administrative law judge to deny the claimed income tax refunds.

¶ 57 Reversed.